**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**CHARLEE BROWN,**

    **Plaintiff,**

      **v.**

**TRINITY WASHINGTON UNIVERSITY,**

    **Defendant.**

**Civil Action No. 22-1612 (JDB)**

<u>**MEMORANDUM OPINION**</u>

Plaintiff Charlee Brown is a retired Metropolitan Police Department ("MPD") officer who was shot in the neck by a stray bullet in August 2020.  The gunshot wound caused Brown serious, lasting injuries.  A year later, Brown enrolled in a master's degree program at Trinity University ("Trinity"), but her symptoms persisted, forcing her to seek accommodations in a number of her courses.  She alleges that, on two occasions, she was granted an extension to submit work, but when she submitted her assignments, Trinity refused to grade or credit them.  Brown brought this action seeking an order compelling Trinity to review her assignments and assign her a grade reflecting her work in the courses as well as compensatory relief.  Trinity filed the present motion to dismiss all claims.  For the reasons set forth below, the Court will grant in part and deny in part Trinity's motion to dismiss.

<u>**Background**</u>

Charlee Brown, an African American woman, worked as an MPD police officer from 2017 to 2022.  Second Am. Compl. for Compensatory & Injunctive Relief [ECF No. 12] ("Compl.")

¶¶ 1, 4.[1]   In August 2020, Brown was shot in the neck by a stray bullet while attending a community party with a friend.  Id. ¶¶ 5–6.  The gunshot wound caused "severe cervical spine injuries," which required Brown to undergo numerous surgeries.  Id. ¶¶ 7, 9.  She suffered "partial paralysis involving one arm, and other cerebral-spinal injuries that caused her serious headaches, weakness on one side of her body, residual pain, and other related consequences."  Id. ¶ 8. Although her symptoms have improved, she still suffers from "headaches, . . . struggles with formation of words[,] and has slower mental processing."  Id. ¶ 10.

Brown enrolled in graduate courses at Trinity to obtain a master's degree in Human Resources Administration.  Id. ¶ 12.  During her first semester, in fall 2021, she enrolled in three courses, one of which was Professor Javier Lopez's Admin course.  Id. ¶¶ 12, 15.  Brown's first notable interaction with Professor Lopez was in November 2021, when he assigned groups to complete a group project, but "failed to assign Plaintiff to any group."  Id. ¶ 16.  After Brown alerted Professor Lopez to the issue, he informed her that he "was waiting to hear from [her] other classmates about needing to join a team" and offered her "the chance to be a team of 1."  Id. ¶ 18.

Near the end of the fall 2021 semester, Brown's "headaches, eye strain, . . . arm and shoulder pain, and fatigue substantially increased, making it much harder for her to complete her work on her computer."  Id. ¶ 20.  Those symptoms had a particularly "noticeable and dramatic impact on her ability" to complete her Admin coursework, so she "spoke to Professor Lopez about her increasing challenges."  Id. ¶¶ 21–22.  He encouraged Brown to seek a reasonable accommodation.  Id. ¶ 22.  Debbie Camp, an advisor, put her in touch with Kimberly McManus at the Disability Services Office, and Brown and McManus "agreed that reasonable accommodation

---

[1] The facts are drawn from Brown's second amended complaint.  See Compl.  At the motion to dismiss stage, the Court "must assume the truth of all well-pleaded factual allegations in the complaint."  In re Harman Int'l Indus., Inc. Sec. Litig., 791 F.3d 90, 99 (D.C. Cir. 2015).

would involve Plaintiff turning in her assignments after the December break." Id. ¶¶ 25–26.  Camp

informed Brown that "she would receive an 'incomplete' in the class until her assignments were

graded," but while her accommodations request was under review, Professor Lopez gave her an F

in the class.  Id. ¶¶ 29–30.  An "incomplete" would not have negatively impacted Brown's grade

point average, but an F did.  Id. ¶ 30.

Although Brown was initially given until February to finish her assignments, id. ¶ 31, her

symptoms worsened over winter break and she underwent surgery in late January, id. ¶ 32–33.

She was given an extension until March 31, 2022 to submit her work.  Id. ¶ 33.  Brown timely

submitted her assignments on March 17, but "Professor Lopez refused to grade the assignments,

and failed to respond to any of Plaintiff's emails to him inquiring about changing her grade."  Id.

¶¶ 36–37.  Trinity's administration "admitted in an email to Plaintiff that it had lost contact with

Professor Lopez."  Id. ¶ 39.  Trinity "has taken no actions to ensure that Plaintiff's assignments

were fairly and carefully graded, and it has not changed Plaintiff's F grade in the course."  Id. ¶

39–40.  As a result of receiving an F, Brown was informed that she would lose the federal financial

aid she had been receiving.  Id. ¶ 69.

Brown returned to Trinity in spring 2022 and enrolled in two classes.  Id. ¶ 43.  Because

she was recuperating from her January surgery, she reached out to both professors, "informed them

of her situation," and asked for "time to recuperate from her injuries."  Id. ¶ 44–45.  Both professors

were amenable, and she had no issue with one of her classes.  Id. ¶ 46.  In the other class, Professor

Bryant Concepcion "indicated that he would accommodate Plaintiff's disability, and provide her

the extra time to make up the two assignments she was going to miss."  Id. ¶ 46–47; see id. ¶ 48

("Plaintiff was told in email correspondence with Professor Concepcion that she would be allowed

to make [the assignment] up as well.").  But despite that representation, Professor Concepcion

refused to allow Brown to make up the second assignment, claiming the course had a "no make-up" policy.  Id. ¶ 49.

In late March 2022, Portia Perkins, a friend of Brown's, informed Brown about a conversation Perkins had with a former MPD employee.  Id. ¶ 55.  Perkins submitted a declaration detailing her conversation.  See Sworn Aff. of Portia Perkins [ECF No. 16] ("Perkins Decl.").  Perkins described a conversation with Will Andre Smith, a new acquaintance, in which Smith discussed a conversation he had with Professor Concepcion, who is a friend of his.  Id. ¶ 23.  Professor Concepcion allegedly had told Smith that Brown was in his class and that "she was shot in her neck and that she has a disability from that incident."  Id. ¶¶ 23–24.  In response, Smith had told Professor Concepcion that Smith "was not shot in her neck."  Id. ¶ 25.  After Perkins corrected Smith and informed him that Brown had, in fact, been shot, Smith responded, "Okay, that may be true, or whatever, but I told him . . . that was 2 years ago!"  Id. ¶ 26.  This conversation—in which Professor Concepcion was told that "Plaintiff was faking her injury"—"coincided with Professor Concepcion's marked shift in attitude towards Plaintiff, and reversal of his decision to allow her to make up both assignments she missed."  Compl. ¶ 57.

Brown communicated these incidents with Professor Concepcion to Trinity's administration.  As early as February 2022, she reported his change in policy and refusal to grade her work, id. ¶¶ 52, 61–62, as well as his hostility towards her, id. ¶ 61.  Trinity eventually apologized to Brown and "admitt[ed] that Professor Concepcion ha[d] violated Trinity University policy by changing his syllabus and assignment policy in the middle of the semester."  Id. ¶ 65.  Trinity had another professor grade Brown's work in Professor Concepcion's class, and she received a C.  Id. ¶¶ 72, 74.

Brown brought this action in June 2022.  She has amended her complaint twice, and the operative complaint now alleges ten statutory and common law causes of action.  In September 2022, Trinity filed a motion to dismiss all ten claims for failure to state a claim.  See Mot. to Dismiss Compl. [ECF No. 13]; Mem. in Supp. of Mot. to Dismiss [ECF No. 13-1] ("Mot. to Dismiss").  Brown filed her opposition in October 2022, see Pl.'s Mem. of Law in Opp'n to Mot. to Dismiss [ECF No. 15] ("Opp'n"), and Trinity timely replied, see Def.'s Reply to Opp'n [ECF No. 17] ("Reply").  The motion to dismiss is thus fully briefed and ripe for decision.

## Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Plaintiffs must plead facts with "enough heft to show that the pleader is entitled to relief," Twombly, 550 U.S. at 557 (cleaned up), but the complaint "does not need detailed factual allegations," id. at 555.

## Analysis

### I.     Brown States a Cognizable Failure to Accommodate Claim.

Brown alleges two reasonable accommodation claims, which she brings under the Rehabilitation Act, 29 U.S.C. § 794(b)(2) and Title III of the Americans with Disability Act ("ADA"), 42 U.S.C. §§ 12181 et seq., (Claim I), and under the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1402.41 et seq. (Claim III).[2]   Because reasonable accommodation claims under these three statutes are "virtually 'interchangeable,'" the Court will

---

[2] Brown's complaint cites to D.C. Code §§ 1-2520 et seq.; however, those provisions were repealed and replaced by §§ 2-1402.41 et seq.

address them together.  See A.M. v. Bridges Pub. Charter Sch., Civ. Case No. 17-177, 2019 WL 1932579, at *2 n.7 (D.D.C. May 1, 2019) (quoting Am. Council of the Blind v. Paulson, 525 F.3d 1256, 1260 n.2 (D.C. Cir. 2008)).  To prevail on her reasonable accommodation claims under all three statutes, Brown must show that "(1) she was a qualified individual with a disability, (2) [Trinity] had notice of her disability[,] and (3) [Trinity] denied her request for a reasonable accommodation."  Ward v. McDonald, 762 F.3d 24, 31 (D.C. Cir. 2014).

Brown's claims appear to focus on three requests for accommodation: (1) her December 2021 request for an extension to complete her fall 2021 coursework based on her lingering gunshot wound-related injuries, (2) her January 2022 request for a further extension to complete her fall 2021 coursework based on surgery related to those same injuries, and (3) her January 2022 request for accommodation due to the need to miss class for her spring 2022 courses because of her surgery recuperation.  See Opp'n at 8, 11.

Trinity does not contest that Brown was a qualified person with a disability.  It also does not contest that the first extension request, made in December 2021, was a request for a reasonable accommodation and that at that time, Trinity had notice of her disability.  See Mot. to Dismiss at 7–8.  But Trinity granted that request, and thus there is no basis for a failure to accommodate claim based on it.[3]  See id.  As to the second and third requests—the request made in January 2022 for a further extension to submit the fall 2021 coursework and the request related to her spring 2022 coursework—Trinity contends that Brown did not put it on notice of her disability or request an accommodation either time.  See id. at 8–10.

---

[3] Brown admits that she did not submit her coursework within the time allotted by the first request.  She instead alleges that she was granted a further extension based on her request in January 2022.

### A.  The Post-Surgery Request for Extension to Complete Brown's Fall 2021 Coursework

Trinity first argues that the second request for an extension, based on the January surgery, was not sufficient "notice of a disability."  Mot. to Dismiss at 8.  This appears to be an argument that the surgery constituted a second, separate disability from that of the injuries related to the gunshot wound that formed the basis of Brown's initial December 2021 accommodation request.  But the allegations in the complaint support the opposite conclusion: Brown's "treating physician determined she needed another surgery" over winter break based on the increasing severity of her symptoms.  Compl. ¶ 32.  The complaint sufficiently alleges that the January surgery was part and parcel with Brown's original disability, namely, the "recuperat[ion] and rehabilitat[ion]" from the gunshot to her neck.  Id. ¶ 9; see also id. ¶¶ 8, 20 (describing Brown's initial symptoms from the gunshot wound and the worsening symptoms over the course of the fall 2021 semester).  True, Brown alleges that the recovery from the surgery involved both "pain-killing drugs," that carried side effects and general recuperation, which are not precisely the same issues as those she experienced in fall 2021.  Compare id. ¶¶ 20–21, with id. ¶ 33.  But Trinity was clearly on notice that Brown was recovering from a gunshot wound, which had involved previous surgeries and recuperation.  A second surgery is a foreseeable manifestation of that disability and not, as Trinity argues, a separate disability of which Brown failed to inform Trinity.  Cf. Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1138 (9th Cir. 2001) (defendant's obligation "extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed").  Thus, Brown has sufficiently pled that at all relevant times, Trinity was on notice of her disability.

Trinity's obligation to respond or provide an accommodation "is only triggered where the employee has actually <u>requested</u> a reasonable accommodation." <u>Badwal v. Bd. of Trustees of Univ. of D.C.</u>, 139 F. Supp. 3d 295, 313 (D.D.C. 2015). Trinity argues that Brown's complaint does not allege that she requested an accommodation, as it "fails to allege that she requested another accommodation from the same official" and identifies several pieces of information about the post-surgery request for an extension that are missing from Brown's complaint. Mot. to Dismiss at 8–9. As support for Brown's argument that she requested a further accommodation following the January surgery, her complaint only alleges that she was given an extension "until March 31, 2022 to submit her work." Compl. ¶ 33. This is certainly a barebones allegation. But the complaint also alleges that this extension was a follow-on extension to the first one, which was indisputably a request for accommodation that Trinity granted, <u>see</u> <u>id.</u> ¶ 31, and that officials at Trinity were aware of and intended to honor the second extension, <u>see, e.g.,</u> <u>id.</u> ¶ 34. Thus, placed in the context of the entire complaint, the Court can reasonably infer that Brown did, in fact, request—and at that time, she was told she received—an accommodation in the form of a further extension.

Trinity argues that if a request is not made through the "same official," it is not through the "proper channels" and, therefore, does not constitute a request at all. Mot. to Dismiss at 8. But Trinity provides no support for the proposition that a request must be made through the same official, and at this stage, the Court is unpersuaded. Brown has sufficiently alleged that she made a request, which Trinity told her was granted, and the factual allegations leading up to and following this request give rise to the inference that the request was made through a sufficient channel.

Finally, Brown has pled that her request was not, in reality, granted: her assignment was not, in fact, graded and she received an F in the class.  Compl. ¶ 40.  The Court therefore concludes that Brown has pled facts sufficient at this stage to support that Trinity functionally denied her reasonable request to extend her initial December 2021 accommodation.

### B.  The Request Relating to Brown's Spring 2022 Coursework

Brown alleges that she was also denied an accommodation related to her spring 2022 coursework.  As alleged in the complaint, Brown registered for two spring 2022 courses, but "had to miss the first classes of the January semester recuperating from her surgery."  Compl. ¶¶ 43–44.  She "reached out to both professors of her new classes, and informed them of her situation, and that she would be attending classes within two weeks."  Id. ¶ 44.  Only the request made to Professor Bryant Concepcion is at issue here.[4]  This request, Brown asserts, was a request "for a reasonable accommodation of a disability."  Id. ¶ 45.

Trinity argues that Brown's request to Professor Concepcion "does not rise to the level of providing notice of a disability to Trinity" and even if it does, it is not an allegation that she "requested an accommodation through the proper channels."[5]  Mot. to Dismiss at 9.

As discussed above, Trinity was on notice of plaintiff's disability during the entire relevant time frame.  Further, Brown alleges that she re-explained her disability to the individual professors, as she informed them of "her situation" and "ask[ed] for the time to recuperate from her injuries," specifying that she would be able to attend class within two weeks.  Compl. ¶¶ 44–45.  Even if Trinity was not on notice before, Brown sufficiently alleges that she put her professors—and by

---

[4] Brown does not allege that the other professor failed to accommodate her request.  Compl. ¶ 46.

[5] Trinity argues in its reply that Brown "did not request a reasonable accommodation until after her request to submit late coursework was denied."  Reply at 4.

extension, Trinity—on notice of the "nature and extent of [her] impairment," <u>Badwal</u>, 139 F. Supp. 3d at 312 (internal quotation marks omitted), with those conversations.

To be sure, some courts have found that when a defendant has "established a fixed set of procedures to request accommodations" a plaintiff's "failure to file a request through this procedure could preclude a claim for failure to accommodate." <u>E.g.</u>, <u>Davis v. George Washington Univ.</u>, 26 F. Supp. 3d 103, 114 (D.D.C. 2014). As an initial matter, Trinity offers no reason to believe that a request directly to a professor is an inappropriate way to request an extension as a reasonable accommodation. In fact, Brown's initial request originated with a professor—the fact that he "encouraged [Brown] to seek a reasonable accommodation for her disability," Compl. ¶ 22, does not necessarily imply that a professor could not accommodate her disability without involving an advisor or the Disability Services Office, particularly when the request is for a course-specific accommodation.[6] <u>Cf.</u> <u>Campbell v. Lamar Inst. of Tech.</u>, 842 F.3d 375, 381 (5th Cir. 2016) ("[T]he record indicates that Campbell's [reasonable accommodations] request was considered at multiple levels of the institution, from the individual faculty members up to the school's President."). And the request was initially seemingly granted by Brown's two professors, which further suggests that a direct request to a professor is an appropriate way to request an accommodation. In any event, that is a fact-specific determination that Brown need not plead in order to state a "cognizable" claim and is thus not a reason for dismissal at this stage. <u>See</u> <u>Stewart v. White</u>, 118 F. Supp. 3d 321, 326 (D.D.C. 2015), <u>aff'd</u>, Civ. A. No. 15-5288, 2016 WL 1695343 (D.C. Cir. Apr. 18, 2016) (noting that burden is on the defendant to "identif[y] 'a fixed set of procedures' it contends plaintiff failed to follow in making the accommodation request").

---

[6] Particularly given that the spring 2022 request would not require Trinity to credit work submitted after the semester concluded, there is no reason to believe anyone other than the professor needed to be involved.

More fundamentally, "[w]hat matters under the ADA are not formalisms about the manner of the request, but whether the [student] . . . provides the [school] with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." Evans v. Davis Mem'l Goodwill Indus., 133 F. Supp. 2d 24, 28 (D.D.C. 2000) (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3rd Cir. 1999)), aff'd, 1 F. App'x 3 (D.C. Cir. 2001). Brown alleges that she told multiple professors and officials at Trinity about her disability, including the nature and extent of her impairment, and that she requested a discrete accommodation—missing class and making up any assignments—which was ostensibly granted.

But as with the fall 2021 extension, Brown functionally did not receive the requested accommodation: despite telling her that she could submit the assignments late, "Professor Concepcion suddenly changed his mind, and refused to allow Plaintiff to make up the second assignment." Compl. ¶ 49. Thus, Brown has adequately pled a failure to accommodate claim related to her spring 2022 coursework.

### C.  Brown's Reasonable Accommodation Claims Are Not Moot

Trinity argues that Brown's claims based on her work in Professor Concepcion's course are moot, as "Trinity assigned another professor to grade her course work." Trinity is correct as far as that goes, but because Brown has requested other relief, including compensatory damages, the claim is not moot. See Young v. D.C. Hous. Auth., 31 F. Supp. 3d 90, 98 (D.D.C. 2014) (denying mootness claim because, among other things, "Defendant ha[d] failed to meet its burden of showing that the fixes it made [to accommodate plaintiffs with disabilities] offer Plaintiffs complete relief").

## II.        Brown Fails to State a Retaliation Claim.

To state a prima facie case for retaliation under the ADA, the Rehabilitation Act, and the DCHRA,[7] a "plaintiff must allege that 1) she 'engaged in protected activity,' 2) she 'was subjected to adverse action by' the defendant and 3) there is a causal connection 'between the adverse action and the protected activity.'"  Alston, 561 F. Supp. 2d at 40 (quoting Mayers v. Laborers' Health & Safety Fund of N. Am., 478 F.3d 364, 369 (D.C. Cir. 2007)).  As to the first prong, "the act of requesting in good faith a reasonable accommodation is a protected activity."  Solomon v. Vilsack, 763 F.3d 1, 15 (D.C. Cir. 2014).  An "adverse action" under the second prong "is one that 'could well dissuade a reasonable [person] from making or supporting a charge of discrimination.'"  Porter v. Shah, 606 F.3d 809, 817–18 (D.C. Cir. 2010).  "[P]urely subjective injuries" do not meet this standard, but any "adverse consequences affecting the terms, conditions, or privileges of [plaintiff's education] . . . such that a reasonable trier of fact could find objectively tangible harm" qualifies.  Holcomb v. Powell, 433 F.3d 889, 902 (D.C. Cir. 2006).  Finally, a "plaintiff may satisfy [the] third element of a prima facie case by showing 'the [university] had knowledge of the [student's] protected activity, and . . . the adverse personnel action took place shortly after that activity.'"  Id. at 903 (quoting Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985)).  However, adverse actions that are "the subject of plaintiff's failure to accommodate claim . . . do[] not supply grounds for a separate retaliation claim."  Buie v. Berrien, 85 F. Supp. 3d 161, 178 (D.D.C. 2015).

---

[7] Because the standard under all three statutes is the same, the Court analyzes claims two and four of the complaint together.  See Alston v. District of Columbia, 561 F. Supp. 2d 29, 40 (D.D.C. 2008) ("The same test [as for retaliation under the ADA] applies under the Rehabilitation Act."); Ranowsky v. Nat'l R.R. Passenger Corp., 244 F. Supp. 3d 138, 143 (D.D.C. 2017), aff'd, 746 F. App'x 23 (D.C. Cir. 2018) ("DCHRA . . . retaliation claims are analyzed the same as claims brought under federal employment discrimination statutes . . . .").

### A. Adverse Action Retaliation Claim

Brown alleges that she "engaged in protected activity" in at least three instances—(1) her request for an extension in fall 2021, (2) her post-surgery request for a further extension for her fall 2021 course, and (3) her post-surgery request to make up assignments for her spring 2022 courses.  In her opposition, she focuses primarily on the fall 2021 coursework and identifies the "adverse action" as Professor Lopez's assignment of an F as her grade in the course.  This severely impacted her GPA, which in turn caused her to lose federal funding for her degree.  See Opp'n at 17.

In opposition, Trinity argues primarily that Brown's "retaliation allegations mirror her failure to accommodate claim . . . 'and so [they] do not supply grounds for a separate retaliation claim.'"  Mot. to Dismiss at 11 (quoting Buie, 85 F. Supp. 3d at 178).  It contends that because the F in Professor Lopez's course was the consequence of Trinity's failure to accommodate—that is, its failure to fairly grade the work submitted in March 2021—the claim is duplicative of her accommodation claim.  See id.  In response, Brown notes that "at the time of her request for accommodation, Plaintiff was informed that she would receive an incomplete (I) in the class, which would not have affected her GPA."  Opp'n at 17.  The adverse action she identifies is thus Professor Lopez's decision to give her an F rather than an "incomplete," which she alleges would have been the appropriate grade.

But the F is a natural consequence of Trinity's failure to accommodate—her final grade was severely impacted by Trinity's failure to grade her coursework.  Her grade is thus the "subject of [her] failure to accommodate claim."   Buie, 85 F. Supp. 3d at 178.  To the extent she argues she deserved an incomplete rather than an F, any promises about receiving an incomplete were

made in the context of providing her accommodations, <u>see</u> Compl. ¶ 30, underscoring the fact that her retaliation claim is simply duplicative of her failure to accommodate claim.

Brown also identifies retaliation related to the spring 2022 course in her complaint, arguing that "Defendant, via Professor Concepcion[,] retaliated against Plaintiff for needing and seeking a reasonable accommodation by changing the course syllabus to deny her the ability to complete the course, . . . by refusing her the ability to submit a course assignment that she was told she could complete before her surgery," and by "giving her a lower grade" in that class.  Compl. ¶¶ 97–98, 121–22.  Trinity moved to dismiss the full retaliation claim, <u>see</u> Mot. to Dismiss at 10–11, and Brown does not discuss her spring 2022 claims in her opposition.  The allegation that Professor Concepcion refused to allow her to complete a course assignment and gave her a lower grade as a result mirrors her failure to accommodate claim exactly.  She does not allege that Professor Concepcion took a separate adverse action beyond refusing to accept her late-submitted coursework.

Because Brown has not identified an adverse action that is not the subject of her failure to accommodate claim, any retaliation claim based on an adverse action will be dismissed.

### B.  Hostile Environment Retaliation Claim

The D.C. Circuit has "recognized a special type of retaliation claim based on a 'hostile work environment.'"  <u>Baird v. Gotbaum</u>, 792 F.3d 166, 168 (D.C. Cir. 2015).  This type of claim involves acts that are "of such severity or pervasiveness as to alter the conditions of . . . employment and create an abusive working environment" and are "adequately linked such that they form a coherent hostile environment claim."  <u>Id.</u> at 168–69 (internal quotation marks omitted).

To make out a hostile environment claim in the educational context, courts require that the university "(1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that

was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school." Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty., OK, 334 F.3d 928, 934 (10th Cir. 2003); accord Stafford v. George Washington Univ., 578 F. Supp. 3d 25, 36 (D.D.C. 2022) (applying this test), rev'd and remanded on other grounds, 56 F.4th 50 (D.C. Cir. 2022). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). "Although a plaintiff is not required to plead a prima facie case of hostile work environment, the alleged facts must nevertheless support such a claim." Johnson v. Shinseki, 811 F. Supp. 2d 336, 345 (D.D.C. 2011).

In support of her hostile environment retaliation claim, Brown makes three general allegations: (1) Professor Concepcion spoke "about Plaintiff behind her back to a third party," Compl. ¶ 60; (2) he refused to grade her assignment and changed his syllabus "in order to assert that Plaintiff could not reasonably pass his course because of the missed second assignment, which he refused to accept," id. ¶¶ 49, 62; and (3) he spoke to Brown in a "terse and hostile tone of voice and demeanor" and was "rude, hostile, curt and dismissive of [her]," id. ¶¶ 52, 73.

As to the first allegation, there is no indication that any alleged conversation between Professor Concepcion and a third party about Brown had a direct effect on her "access to the educational benefits or opportunities," Stafford, 578 F. Supp. 3d at 36. Any actual effect on Brown's experience is described in the second and third sets of allegations—the conversation with a third party is, at most, an explanation as to why Professor Concepcion acted the way he did.

The second set of allegations mirrors Brown's allegations in support of her failure to accommodate claim and thus cannot be used to support a retaliation claim.  See Floyd v. Lee, 968 F. Supp. 2d 308, 334 (D.D.C. 2013) ("[I]f the denial of a request for accommodation could itself support a claim of retaliation based on the request, then every failure-to-accommodate claim would be doubled.").  And the third set of allegations regarding Professor Conception's rude and dismissive demeanor—while unfortunate—does not rise to an objective level of hostility required to make out a hostile environment claim.  Brown does not allege any specific demeaning or humiliating comments.  Cf. Floyd, 968 F. Supp. 2d at 329, 334 (finding that a complaint describing several specific "humiliating" and "derogatory" comments about plaintiff's "vision and the pace at which she worked," in light of the plaintiff's pro se status, "sufficiently (if barely) alleged" a hostile work environment").  The Supreme Court has cautioned against allowing hostile environment claims to "become a general civility code," Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotation marks omitted), and although supervisors "may be harsh, unfair and rude, . . . conduct so characterized does not necessarily rise to the level of a [hostile environment]," Peters v. District of Columbia, 873 F. Supp. 2d 158, 188 (D.D.C. 2012).  General allegations of rude and hostile tone or demeanor simply do not rise to the level required to demonstrate a "severe, pervasive and objectively offensive" course of conduct.  Stafford, 578 F. Supp. 3d at 36.  Thus, the Court will dismiss Brown's hostile environment retaliation claim.

**III.    Brown Fails to State a Race or Gender Discrimination Claim.**

A claim of discrimination under the DCHRA requires that a plaintiff show "(1) she is a member of a protected class; (2) she suffered an adverse . . . action; and (3) the unfavorable action gives rise to an inference of discrimination."  McCaskill v. Gallaudet Univ., 36 F. Supp. 3d 145, 152 (D.D.C. 2014).  As to the third element, "a plaintiff must present facts that 'give[] rise to an

16

inference of discrimination.'" Best v. District of Columbia, Civ. A. No. 20-1134 (FYP), 2022 WL 816087, at *5 (D.D.C. Mar. 17, 2022) (quoting Czekalski v. Peters, 475 F.3d 360, 364 (D.C. Cir. 2007)).  "The pleadings must allow a causal inference that the protected trait was a motivating factor for the adverse . . . action." Id.; see also Slate v. Pub. Def. Serv. for D.C., 31 F. Supp. 3d 277, 298 (D.D.C. 2014) ("Such '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice' at the pleading stage and cannot sustain the plaintiff's discrimination claim." (quoting Iqbal, 556 U.S. at 678)).

Although alleging that "she was treated differently than similarly situated [students]" is "[o]ne method by which a plaintiff can satisfy the third prong," it "is not the only way." George v. Leavitt, 407 F.3d 405, 412 (D.C. Cir. 2005).  For example, "one way for a plaintiff to show that an adverse . . . decision was made for a discriminatory reason is to show that the nondiscriminatory explanation the defendant proffered for its decision was false." Czekalski, 475 F.3d at 366 (cleaned up); see also Apollo v. Bank of Am., N.A., 315 F. Supp. 3d 436, 438 (D.D.C. 2018) (denying motion to dismiss where plaintiff made "specific factual allegations," such as "denial of bank services for false reasons," which would "support a plausible inference of race discrimination").

Brown has not alleged any facts that would "create a reasonable inference that race [or] sex . . . was a factor in the . . . decision at issue." Easaw v. Newport, 253 F. Supp. 3d 22, 26 (D.D.C. 2017) (quoting Krodel v. Young, 748 F.2d 701, 705 (D.C. Cir. 1984)).  For the two "adverse actions" she alleges related to her fall 2021 course—that Professor Lopez forced her to work alone on a group assignment (which she ultimately completed), see Compl. ¶¶ 16–19, and his refusal to fairly grade her work despite her requested accommodation, id. ¶¶ 34–37, 42—Brown does not allege any facts to suggest that these actions were taken on the basis of her gender or race.

If anything, because Brown "specifically pleads that adverse . . . actions were taken against [her], not on the basis of [her protected class], but because of [her] protected . . . activity," any inference that race or gender was a motivating factor is less plausible.  See Slate, 31 F. Supp. 3d at 298.

Brown's spring 2022 allegations suffer from similar problems.  As described above, she alleges that Professor Concepcion "talk[ed] about her behind her back, fabricat[ed] a 'no-makeup policy' after allowing Plaintiff to make up assignments, and l[ied] about the requirements of the course when he changed the syllabus to keep Plaintiff out of his class."  Opp'n at 25 (citations omitted).  But nothing in those facts give rise to any inference related to race or gender.  As with her fall 2021 allegations, the specific facts alleged suggest that the adverse actions were taken in response to her request for accommodation.  For example, she alleges that Professor Concepcion's conversation with a third party only covered "her medical condition" and "her educational and classroom status"—there is no mention of her race or gender being a topic of discussion.  Compl. ¶ 58; see also id. ¶ 59 ("Professor Concepcion believed Plaintiff was not truly disabled and in need of an accommodation.").

Brown's argument can be summed up by a line in her own brief: she cannot identify a reason for the adverse actions, "which begs the question[,] why?"  Opp'n at 22.  But a plaintiff must do more than identify an adverse action and question the motivation for it.  See Easaw, 253 F. Supp. 3d at 25 (noting that factual allegations must "nudge the claims across the line from conceivable to plausible" (cleaned up)).  Thus, the Court will dismiss Brown's race and gender discrimination claims for failure to state a claim.

### IV.   Brown Fails to State a Claim for Breach of Contract or Breach of the Implied Covenant of Good Faith and Fair Dealing.

Brown's seventh and eighth claims allege common law breach of contract and breach of the implied covenant of good faith and fair dealing.  See Compl. ¶¶ 148–74.  She alleges a series

of contracts formed between Trinity and herself: (1) "a binding contract with Trinity for the provision of accredited education services[] that was supported by substantial consideration in the form of fees," of which one term is that professors will "<u>timely</u> grade assignments," <u>id.</u> ¶¶ 149–50; (2) "several contractual agreements with Trinity about how and when it was going to grade her work," which were "detailed and in writing, and supported by valuable consideration," <u>id.</u> ¶ 151; and (3) an agreement giving rise to a "contractual obligation to keep [her] academic and health information confidential," <u>id.</u> ¶ 157.  She also alleges that Trinity breached all three contracts, as well as the implied covenant of good faith and fair dealing inherent in each.

Brown first argues that a general contract exists between a school and a student "based on university publications, receipt of tuition and fees, and the working expectations of the parties." Opp'n at 26 (citing <u>In re Univ. of San Diego Tuition & Fees COVID-19 Refund Litig.</u>, No. 20cv1946-LAB-WVG, 2022 WL 959266, at *4 (S.D. Cal. Mar. 30, 2022)).  She argues that this implied contract clearly includes "providing instruction and grading work handed in."  <u>Id.</u> at 27.

"Courts in the District of Columbia 'recognize the general rule "that the relationship between a university and its students is contractual in nature."'" <u>Chenari v. George Washington Univ.</u>, 172 F. Supp. 3d 38, 47 (D.D.C. 2016) (quoting <u>Manago v. District of Columbia</u>, 934 A.2d 925, 927 (D.C. 2007)), <u>aff'd</u>, 847 F.3d 740 (D.C. Cir. 2017).  However, any such contract does not provide Brown with the relief she seeks here.  "[T]he keystone of an implied-in-fact contract is the parties' reasonable expectations at the time of contracting."  <u>In re Univ. of San Diego Tuition</u>, 2022 WL 959266, at *5.  Whatever the parties' reasonable expectations of a university's obligation to grade work at the time of contracting, they certainly do not extend to grading and crediting work filed after the conclusion of the semester or after a deadline.

Brown appears to concede this in her brief: although she frequently characterizes the general contractual obligation that Trinity allegedly breached as an obligation to grade her work, she notes that "Defendant is not normally contractually required to give students additional time to complete assignments."  Opp'n at 29.  She argues that her case is different because "Defendant agreed in writing to do so."  Id.  Thus, she appears to agree with the Court's conclusion: if Trinity had a contractual obligation to grade Brown's work that was filed past the due date based on a disability accommodation, it could only come from a specific contract formed in fall 2021 or spring 2022.

Brown also argues that Trinity violated the implied covenant of good faith and fair dealing inherent in the general educational contract.  "District of Columbia law . . . recognizes that 'all contracts contain an implied duty of good faith and fair dealing.'"  Chenari, 172 F. Supp. 3d at 47 (quoting Murray v. Wells Fargo Home Mortg., 953 A.2d 308, 321 (D.C. 2008)).  "[T]o show that a university breached the implied covenant of good faith and fair dealing, a plaintiff must allege 'either bad faith or conduct that is arbitrary and capricious' and, in resolving such cases, courts must not 'substitut[e] their judgment improperly for the academic judgment of the school.'"  Chenari v. George Washington Univ., 847 F.3d 740, 745 (D.C. Cir. 2017) (quoting Wright v. Howard Univ., 60 A.3d 749, 754–55 (D.C. 2013)).  However, courts in this District have concluded that "[a] party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are identical to a claim for relief under an established cause of action."  Jacobsen v. Oliver, 201 F. Supp. 2d 93, 98 n.2 (D.D.C. 2002) (internal quotation marks omitted) (quoting Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91–92 (3d Cir. 2000)); see also Abreu v. Howard Univ., No. 21-cv-397 (APM), 2022 WL 2191695, at *2 (D.D.C. June 17, 2022) (quoting this language and noting that the plaintiff cannot "shoehorn his accommodation claims

into a claim for violating the covenant of good faith and fair dealing"). Thus, Brown cannot maintain a duty of good faith claim based on the same allegations as her failure to accommodate claim.

Turning to the conversations Brown had with school officials about her accommodations, any agreements between herself and school officials that related to an extension of time in either semester are not enforceable contracts under the facts as she pled them. "[A] promise to perform a pre-existing legal obligation does not create mutuality of obligation and cannot give rise to an enforceable contract." Di Lella v. Univ. of D.C. David A. Clarke Sch. of L., 570 F. Supp. 2d 1, 11 (D.D.C. 2008). Brown alleges that she reached several agreements as to how and when the university was going to grade her work. Compl. ¶ 151. But as described in the complaint, Trinity only agreed to do what it was already legally obligated to do: agreeing to her requested reasonable accommodation of an extension. See, e.g., id. ¶ 26 ("Plaintiff worked with Ms. McManus, and they agreed that reasonable accommodation would involve Plaintiff turning in her assignments after the December break."). Accordingly, she "does not make any allegation that the University promised to provide anything . . . more than it was already obligated to provide [her]," and her breach of contract claim "fails, among other reasons, for want of consideration."[8] Wanko v. Cath.

---

[8] In the event that the Court finds that there was no consideration—as it now has—Brown has requested leave to amend her complaint to rely on a promissory estoppel/detrimental reliance theory. See Opp'n at 32 & n.2. Under D.C. law, "to hold a party liable under the doctrine of promissory estoppel there must be a promise which reasonably leads the promisee to rely on it to his detriment, with injustice otherwise not being avoidable." Bender v. Design Store Corp., 404 A.2d 194, 196 (D.C. 1979) (cleaned up). At first blush, the facts described in Brown's motion may fit this definition: Trinity promised to grade her late-submitted assignments, and Brown reasonably believed Trinity's promise and remained enrolled in reliance on that promise. See Opp'n at 32. But when one makes a promise to perform a preexisting legal duty, only in rare circumstances should promissory estoppel—a workaround of traditional contract principles—be available to enforce that promise. If it was readily available, then the general rule precluding contract formation based on a promise to perform a preexisting duty would be functionally useless. It could be said that Brown's reliance was not on the promise but rather on the preexisting duty. Or it could be that injustice is unlikely to occur: if Brown is entitled to relief, it would be based on the statutory obligation to provide accommodation, not an equitable doctrine like promissory estoppel. Either way, the Court is hesitant to allow a claim sounding in contract based on, at its core, a claim that a defendant failed to perform a preexisting legal duty. See 4 Williston on Contracts § 8:8 (4th ed.) (warning that promissory estoppel doctrine should only be further broadened in cases that "do not harm

Univ. of Am., Civ. Case No. 08-2115 (RJL), 2009 WL 3052477, at *4 (D.D.C. Sept. 22, 2009);

see also Di Lella, 570 F. Supp. 2d at 11–12 (holding that plaintiff's breach of contract claim

"fail[ed] for lack of consideration" because the letter plaintiff claimed constituted a contract

"promise[d] and obligate[d] the Law School to provide nothing more than the Law School was

required to provide by law").[9]

Finally, Brown argues that "a material term of her contract with Defendant was that

Defendant would honor and guard the privacy of her academic status and achievement." Opp'n at

30; see Compl. ¶ 157. Professor Concepcion violated that term, she alleges, when he spoke about

Brown to a third party.[10] Opp'n at 30–31. As an initial matter, it is not clear that this is, in fact, a

material term in a traditional academic contract—Brown simply asserts it. But the claim has a

more fundamental flaw. Brown does not allege any injury from this alleged breach. See Compl.

¶ 158 (listing harms from breach of contract as Brown's inability "to complete the course work,"

the loss of federal funding, and academic debt). Nor does she offer any suggestion as to how the

Court may be able to redress the relevant harm: the relief sought in her breach of contract claim is

an "ORDER from the Court, mandating specific performance of the contract, and requiring that

Trinity procure a qualified professor to grade Plaintiff's work and allow her to obtain credit for the

work she completed." Id. ¶ 159. Such an order would not redress any (unspecified) harms to

---

the classical conception of contract as the result of a bargained-for exchange[] and . . . clearly advance the interests of
justice").

[9] "In the absence of a contractual obligation, the University cannot have violated the implied covenant of
good faith and fair dealing by allegedly failing to provide an accommodation." Abreu, 2022 WL 2191695, at *2.
Because Brown has not alleged any contractual obligation related to the extensions, her good faith and fair dealing
claim related to those promises will be dismissed as well.

[10] Brown also claims in her brief that "Professor Concepcion discussed Plaintiff's status in his class." Opp'n
at 30–31. But this allegation appears nowhere in the complaint, so the Court will disregard it.

Brown from the conversation between Professor Concepcion and his friend.  Thus, she has not pled (among other things) standing to bring claim based on this alleged breach.

The Court will accordingly deny Brown's claims for breach of contract and breach of the covenant and good faith and fair dealing.

## V.      Brown Fails to State a Claim for Negligence or Negligent Supervision.

Brown's final two claims allege negligence and negligent supervision.  See Compl. ¶¶ 175–91.  "The plaintiff in a negligence action must establish: (1) that the defendants owed him a duty of care, (2) that the defendants breached that duty, and (3) that the breach proximately caused damage to the plaintiff."  Wanko, 2009 WL 3052477, at *6.  Similarly, to show negligent supervision, a plaintiff must plead that an employer "breache[d] a duty of care which proximately result[ed] in injury" to the plaintiff.  Phelan v. City of Mount Rainier, 805 A.2d 930, 937 (D.C. 2002).  And "[f]or the more specific tort of negligent supervision, . . . the plaintiff must further show that the employer 'knew or should have known [that] its employee behaved in a dangerous or otherwise incompetent manner,' and that the employer nonetheless 'failed to adequately supervise the employee.'"  Islar v. Whole Foods Mkt. Grp., Inc., 217 F. Supp. 3d 261, 265 (D.D.C. 2016) (quoting Phelan, 805 A.2d at 937–38).

Brown's negligence claims mirror the claims already discussed: (1) that Trinity had a duty to "ensur[e] that she was able to attend classes[] and obtain the worth of the fees she paid" and to "ensure that its staff adhere to all local, state and federal laws," Compl. ¶¶ 176, 182—i.e., to prevent the actions that gave rise to her failure to accommodate claim, and (2) that Trinity "had a duty to ensure that the faculty and staff of Trinity honor and protect the privacy rights of Trinity students," id. ¶ 181—i.e., to prevent the alleged conversation between Professor Concepcion and Smith.  Brown's negligent supervision claim echoes her negligence claim, see, e.g., id. ¶¶ 187–89,

and further alleges that Trinity "failed to train or properly supervise Professor Concepcion about the impropriety of discussing the classroom status and performance of Trinity students with his personal friends," id. ¶ 189.

Starting with the claim that Trinity breached its various duties of care by failing to grade and credit Brown's work, Brown fails to identify a duty owed by Trinity sufficient to state a negligence claim. She cannot rely on any duties imposed by the DCHRA, ADA, or other statutes because, under D.C. law, "a negligence claim 'may be predicated only on common law causes of action or duties imposed by the common law.'" Martin v. District of Columbia, 968 F. Supp. 2d 159, 166 (D.D.C. 2013) (quoting Griffin v. Acacia Life Ins. Co., 925 A.2d 564, 576 (D.C. 2007) (per curiam)). Although negligence claims could "be based on a separate common law tort, which might also be grounds for a statutory claim under the DCHRA" or other statutes, Brown does not plead or argue such a basis. Griffin, 925 A.2d at 577; see Wanko, 2009 WL 3052477, at *6 ("As [plaintiff] has failed to plead a legal basis for the duty supposedly owed him by these defendants, his negligence claim must also be dismissed."). The same is true for claims of negligent supervision. See Griffin, 925 A.2d at 576–77 (rejecting claim that employer negligently supervised employee accused of sexual harassment because sexual harassment is not a common law tort). Accordingly, Brown's negligence-based claims related to the failure to ensure her work was graded and credited will be dismissed.

Brown does identify a common law tort on which her privacy-based claims rely: the common law right to privacy, which has been adopted in some form in D.C. See, e.g., Adler v. Vision Lab Telecomms., Inc., 393 F. Supp. 2d 35, 41 (D.D.C. 2005). In particular, she cites Dodd v. Pearson, which articulated the right to privacy based on the First Restatement of Torts, published in 1939: "A person who unreasonably and seriously interferes with another's interest in not having

his affairs known to others or his likeness exhibited to the public is liable to the other." 279 F.

Supp. 101, 105 (D.D.C. 1968) (quoting Restatement (First) of Torts § 867 (1939)), aff'd in part,

rev'd in part, 410 F.2d 701 (D.C. Cir. 1969). However, since then, "District of Columbia courts

have adopted the Restatement (Second) of Torts § 652 for invasion of privacy torts." Whitehead

v. Paramount Pictures Corp., 53 F. Supp. 2d 38, 53 (D.D.C. 1999), aff'd, No. 99-7137, 2000 WL

33363291 (D.C. Cir. Apr. 19, 2000). The modern Restatement includes four distinct privacy-

related torts, see Restatement (Second) of Torts §§ 652B–E (1977), but the facts alleged by Brown

do not state a breach of duty owed under any of them.[11]

Although Brown does not specify which articulation of invasion of privacy gives rise to

the duty she alleges Trinity breached, the closest duty based on the facts alleged is § 652D,

Publicity Given to Private Life. See Adler, 393 F. Supp. 2d at 41 & n.10 (analyzing unspecified

right-to-privacy claims under the most on-point of the four torts recognized by the Restatement).

But even under that section, Trinity had only a duty to prevent Professor Concepcion from giving

"publicity to a matter concerning the private life of another . . . if the matter publicized is of a kind

that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to

the public." Restatement (Second) of Torts § 652D. And importantly, publicity "means that the

matter is made public"—"it is not an invasion of the right of privacy, within the rule stated in this

Section, to communicate a fact concerning the plaintiff's private life to a single person or even to

a small group of persons." Id. cmt. a. Professor Concepcion is, at most, alleged to have told one

person. Thus, Brown has not alleged that Professor Concepcion violated a common law privacy

---

[11] Brown contends that if the Court finds that the "sworn declaration from Plaintiff's witness does not establish sufficient details of the conversation with Mr. Smith to support her claims, such is a factual matter that must be fleshed out in discovery." Opp'n at 37. But only well-pleaded claims may proceed to discovery. If there are neither alleged facts showing that the elements of the claim could be met nor allegations giving rise to a reasonable inference of such, then the claim must be dismissed and cannot proceed to discovery.

right, and Trinity thus had no duty to prevent him from telling a friend that Brown "was shot in her neck and that she has a disability from that incident," Perkins Decl. ¶ 24, or to further supervise him upon learning of the conversation from Brown.  The Court will accordingly dismiss both of Brown's negligence-based claims.

## Conclusion

For the foregoing reasons, the Court will dismiss Brown's claims for retaliation (Counts II and IV), discrimination (Counts V and VI), breach of contract (Count VII), breach of the covenant of good faith and fair dealing (Count VIII), negligence (Count IX), and negligent supervision (Count X).  It will deny Trinity's motion to dismiss Brown's claims for failure to accommodate (Counts I and III).

/s/
JOHN D. BATES
United States District Judge

Dated: March 20, 2023